**STATE, Plaintiff-Appellee, v. MILAM, Defendant-Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 24571.   Decided March 11, 1959.

John T. Corrigan, Pros. Atty., Dennis J. McGuire, for plaintiff-appellee.

Adrian B. Fink, Jr., Joseph W. Bartunek, for defendant-appellant.

## OPINION

By KOVACHY, J:

The defendant, Dallas Edward Milam, with James Wilson Davis and

Robert Lee Lyons, was jointly indicted on three counts, each of murder in the first degree, in connection with the shooting of Edward Lentz, a lieutenant on the Cleveland police force.

Milam waived a jury trial and elected to be tried before three judges, who, upon trial, adjudged him guilty of murder in the first degree as to counts one and two, with a recommendation of mercy as to each count. Count one charged the killing of a person while in the perpetration of a robbery and count two, the killing of a policeman while in the discharge of his duties. Milam was found not guilty as to count three, which charged the killing of a person purposely and with deliberate and premeditated malice. Motion for new trial, for judgment notwithstanding the verdict, and mitigation were all overruled, and the defendant was sentenced for life to the Ohio Penitentiary. The appeal here is on questions of law from the judgment entered in the Common Pleas Court of Cuyahoga County. The record discloses no substantial dispute as to the salient facts.

Milam was an eighteen-year old white male raised in a family of nine children in West Virginia, where he obtained eleven years of schooling. He came to Cleveland in August, 1957, to live with his older unmarried brother and obtained employment at the Ford Motor Company on the three to eleven P. M. shift. He drove a 1950 Cadillac automobile which he had acquired from a friend in Akron by taking over the payment of the balance of $522.00 owing on it. At the time of the occurrences involved herein, he and his brother were living at 1516 East 55th Street.

Early on the morning of Thursday, December 6, 1957, he met one James Davis, a thirty-year old colored male, at a tavern near his home. After the tavern closed at 2:30 A. M., Davis accosted him on the street, and got him to go to the home of Alonzo and Ruth Buchanan, colored folk, to engage in some after hours drinking. While there, he and Davis entered into a poker game with the Buchanans, in which endeavor Milam lost some $37.00. Davis had an arrangement with Buchanan to get a percentage of winnings from players he brought to the place. In the early morning of December 7, 1957, Davis again took Milam to the Buchanans. Upon this occasion, he watched a poker game in progress and drank beer.

At 3:30 A. M. on Monday, December 9, 1957, Davis, in the company of one Robert Lyons, a total stranger to Milam, awakened Milam to tell him that he and Lyons had discovered that the Buchanans played poker with marked cards and asked Milam to dress and accompany them to the Buchanans to recover the monies that each had been cheated out of by the Buchanans. Milam, in answer to this request, said that he did not want any trouble and did not want to go, but upon the assurance of Davis over and over again that there would be no trouble and that there was nothing to worry about, was persuaded to go, saying: "Well, if you're sure that there's going to be no trouble I will go with you." Milam thereupon dressed, went with Davis and Lyons to his automobile in a parking lot nearby, and drove to the home of the Buchanans. Upon stopping in front of the Buchanan home, Milam was disinclined to enter

with them but did so upon Davis' insistence again that there would be no trouble or violence.

Upon entering, they met Buchanan and his wife and the five of them assembled in the basement room. After some talk about marked cards and the return of the money Milam had lost, Davis suddenly and unexpectedly drew a .38 caliber revolver from his waist, and pointing it at Alonzo Buchanan, said, "This is it.", "This is for real.", and demanded to know where the money was. Buchanan said he would send his wife Ruth to get it but Davis declined this offer and demanded that they inform him where it was. When told that it was under the bed in a bag, Davis sent Lyons up, who returned with a bag of money containing $420.00. The Buchanans were then ordered by Davis to lie on the floor, face down, and were each tied up with strips torn from a bedspread on the couch. The Buchanans were then relieved of the valuables on their persons consisting of two watches, a ring and cash; the upstairs was searched where three revolvers were obtained; and the three visitors drove off with Milam at the wheel and Davis and Lyons alongside him in the front seat.

They had proceeded a short distance when a police car sounded its siren directly to the rear of their automobile. Milam testified that Davis or Lyons said to him, "Don't stop," and that he said, "No, I'm going to stop," which he did right there in the middle of the street, since cars were parked on both sides of the street. Within seconds, Lieutenant Edward Lentz of the Cleveland Police Department appeared at the driver's side of the Cadillac and asked them what was going on and informed them that a man had complained to him that he had been robbed by them. Lyons, answering for the three of them, said that they had not robbed anybody but had only taken what belonged to them. Lieutenant Lentz instructed them to stay in the automobile and returned to the police car where he used the radio telephone. He then returned to the Cadillac, opened the left front door, removed the car keys, and told them to stay in the automobile and according to Milam told them that they were under arrest. Lyons at the time tried to get out of the automobile and was told by the lieutenant to remain, which he did. Then Buchanan came to the Cadillac and, pointing to them, said, "Those are the guys that robbed me." Upon that remark, Davis and Lyons started shouting, during which Lyons again tried to get out and again was ordered to remain in the car by Lieutenant Lentz. While Lentz was reaching for the bag of money, Lyons got out of the automobile with a .38 caliber revolver in his hand and rushed to the rear to confront Buchanan. Lentz, standing in the open door with the bag in his hand, turned toward Lyons and ordered him to get back into the Cadillac. Davis, at that moment, motioned for Milam to join him in escaping. Milam declined. Lyons, who was aiming his gun at Buchanan when accosted by Lentz, shifted his aim at Lentz and fired, the pellet striking Lentz in the forehead above the right eye. Lyons directed another shot at Lentz as he lay on the ground. Davis ran off during this commotion. Lyons and Buchanan ran in opposite directions, Buchanan toward his home. Milam remained at the wheel in his automobile. He

was found there some minutes afterwards by other police officers, crying.

Counsel for the defendant, in their brief, claim that the record clearly shows eleven reasons why Milam is innocent of these charges. Rephrased, they are:

1. That the defendant never intended to rob the Buchanans and so did not engage in the perpetration of a robbery;

2. That the defendant never entered into any conspiracy to commit a robbery;

3. That the defendant did not aid or abet Davis or Lyons in the robbery;

4. That the defendant informed Davis and Lyons beforehand that he would not be a party to any violence and that he consequently did not enter into any conspiracy to commit an unlawful act;

5. That the defendant did nothing to aid, abet or assist or encourage Davis or Lyons other than those things which he was forced to do out of fear for his own safety and welfare and under duress;

6. That the defendant withdrew from any connection with Davis and Lyons and repented of any wrongdoing when he entered the escape car with them, and that he therefore could not be held accountable for what happened thereafter;

7. That the defendant refused to aid or assist Davis and Lyons in flight and stopped the escape car although urged to go on, thus giving notice to them that they could not look to him for aid or encouragement thereafter;

8. That the defendant completely submitted to arrest and as a consequence was not responsible for what happened thereafter;

9. That Davis and Lyons saw that the defendant had submitted to the control of the police officer and that they all were under the control of said officer and so knew that they could not look further to aid or encouragement from the defendant;

10. That when Davis and Lyons left the escape car, they knew that the defendant could not be counted upon and were on their own for what occurred thereafter;

11. That upon the three in the escape car obeying the lieutenant's order to remain in the car after stopping, the robbery had come to an end and whatever happened thereafter was apart from the robbery and the sole responsibility of those engaged in such happening.

The State maintains that the evidence submitted at the trial of this case proved the defendant guilty beyond a reasonable doubt; that the evidence clearly disclosed that Milam voluntarily joined and became part of the conspiracy and common purpose to rob the Buchanans; that under Ohio law, flight immediately ensuing upon the commission of a robbery with no break in the chain of events is part of the res gestae of the crime perpetrated, and cites **State v. Habig, 106 Oh St 151,** 140 N. E. 195, as authority; that the principle of law enunciated in the Habig case applies to the facts in this case; and that the defendant by actively participating in the conspiracy set a force in motion that carries responsibility with it for all wrongful acts resulting from such activity unless he had voluntarily and effectively withdrawn in time to give his fellow

conspirators a chance to follow his good example, and that even the intervention of an arrest would not exonerate him from any acts reasonably to be committed in carrying out the conspiracy.

Milam, in court as well as in his statement to the police, admitted participating in the robbery. He pleaded duress as his defense. This, in our opinion, was the paramount issue in the case.

Duress was recognized as a defense in criminal cases by the Common Law of England. In Rex v. Crutchley, tried in the Court of King's Bench, 24 English Common Law Reports, 490, duress was pleaded as a defense by the defendant. The evidence was, that the defendant was seen striking a threshing machine a blow with a sledge hammer as a member of a mob. He, then, was permitted to testify that he with several others was compelled to go with the mob and that he and these several others "agreed to run away from the mob the first opportunity." The evidence was that the defendant left the mob at the first opportunity. The verdict was not guilty.

The defense of duress in criminal cases has found expression in those states of the United States which have had occasion to consider it.

It is stated in paragraph one of the syllabus in Nall v. Commonwealth, 208 Ky. 700, 271 S. W. 1059:

"The law will excuse a person when acting under coercion or compulsion for committing most, if not all, crimes, except taking life of an innocent person."

See:

State v. Moretti, 66 Wash. 537, 120 Pac. 102; Ross v. State, 169 Ind. 388, 82 N. E. 781; Beal v. State, 72 Ga. 200; State v. Nargashian, 26 R. I. 299, 58 Atl. 953; People v. Repke, 103 Mich. 459, 61 N. W. 861; State v. St. Clair, Mo. , 262 S. W. (2d) 25; Respublica v. McCarty, 2 U. S. (2 Dall.) 86, 1 L. Ed. 300; People v. White, 137 Cal. App. 467, 30 P. (2d) 555; People v. Martin, 13 Cal. App. 96, 108 P. 1034; U. S. v. Haskell and Francois, 4 Wash. C. C. 402; 8 R. C. L. 125, Sec. 100; 16 Corpus Juris 91, Sec. 59; Law of Crimes, Clark & Marshall, 3rd ed., 104, Sec. 67 (a); 106 Am. St. Rep. 721; 4 Va. L. R. 519.

The generally accepted rule is stated in 40 A. L. R. (2d) at page 910:

"It has been stated generally that in order to constitute a defense to a criminal charge other than taking the life of an innocent person, the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done."

The Supreme Court of Ohio had occasion to state the law with respect to the defense of duress in a criminal case in **State v. Sappienza, 84 Oh St 63**, 95 N. E. 381, the syllabus reading:

"Where, in the trial of an indictment for robbery, it is proved beyond a reasonable doubt, that the defendant was present at the time and place of the crime and participated in the acts which constituted the robbery, and the defendant, for his defense, interposes a plea of duress, the burden is not on the state to disprove such plea, but is on the defendant to maintain his plea by a preponderance of the evidence."

See **15 O. Jur. (2d), 494, Section 323.**

Since the defendant in the instant case conceded participation in the robbery, the burden rested with him to maintain his plea of duress by a preponderance of the evidence.

\* \* \* \* \*

The record shows that the defendant was reluctant to go with Davis and Lyons to the Buchanan home for the purpose of getting back the money he had been cheated out of, and only went when assured that there would be no trouble or violence.

The trial court in its conclusions of fact stated:

"1. It is clear to the court that the evidence does not disclose beyond a reasonable doubt that the defendant, Dallas Milam went to the Buchanan home with Davis and Lyons on the morning of December 9, with any preconceived plan or design or conspiracy to precipitate a robbery."

It is our opinion and we hold that the record **conclusively** discloses that the defendant was **not** a party to any "preconceived plan or design or conspiracy to precipitate a robbery."

The record also shows, that when Davis pointed the revolver at the Buchanans, Milam was sitting about a foot from Alonzo Buchanan, who was standing, and that he then got permission from Davis to stand back of him. Davis ordered the Buchanans to lie on the floor face down. He then ordered Lyons to tear a bedsheet on the couch into strips and with these, he and Lyons tied up the Buchanans. Milam testified that he in no way helped. Mrs. Buchanan, however, testified that she saw Milam hand some of the strips to Lyons and that Milam assisted Davis in tying her up. Davis said that Milam merely untied a strip that was choking her. Milam said he only said she was tied too tightly. The record clearly shows that Davis and Lyons took the valuables from the Buchanans without any help from Milam; Davis ordered Lyons to go upstairs to search for the money; Lyons returned with the bag of money; Lyons then again went up to procure a .38 caliber revolver which Buchanan said was in the buffet drawer; Lyons returned with this pistol and a strong box which, however, contained no money; Davis decided to have the three go upstairs to search for some $100 bills which he believed had been hidden upstairs by Buchanan; before they left the basement room, Davis told Milam to take a drink of whiskey, which Milam did; Davis told Milam to carry the bottle of whiskey, which Milam did; the three went upstairs to look for the $100 bills; the drawers of the bureaus were searched and a mattress lifted up under which two revolvers were found, a .38 caliber and a .32 caliber; Lyons told Milam to take the .38 caliber revolver, which Milam refused; Lyons then handed Milam the .32 caliber revolver, which Milam took and put in his pocket; Davis handed Milam the bag of money, which he put into another pocket; the three then left the home and got into Milam's automobile.

With respect to the upstairs scene, Milam testified that he did not engage in any searching of the drawers and took the .32 caliber revolver only when Lyons insisted he carry one of the two revolvers. Davis testified that Milam engaged in the search of the drawers with them while he stood at the door of the room. Milam also testified, and this is not

contradicted in the record, that Davis had the gun in his right hand throughout and motioned with it when ordering him to do things, and that when they walked upstairs, the order was, Lyons in front, Milam in the middle and Davis to the rear with the revolver in his hand.

The record discloses, however, that Mrs. Buchanan testified that no card playing had even taken place in the basement of her home and that she had never seen Milam prior to the morning of the robbery, which clearly was contrary to the established facts, and that Davis, whose testimony as that of an accomplice had to be received with caution and carefully scrutinized, told a trusty in the County Jail that "the white boy had nothing to do with the crime that he was involved in" and that "the white boy didn't know what he was getting into." Davis, also, had been read Milam's statement to the police and knew that Milam was cooperating fully with the police and had given them damaging evidence as to his part in the transaction.

A reviewing court, when passing upon the weight of the evidence, will consider the credit to be given the testimony of a witness where the record on its face presents evidence which clearly impugns the credibility of such witness as to a material fact in the case.

It seems to us, accordingly, that Mrs. Buchanan and Davis were both discredited witnesses and that their testimony with respect to Milam's part in the robbery, different from that given by Milam, was unworthy of belief and cannot be given any weight whatever.

In The People v. Crump, 5 Ill. (2d) 251, 125 N. E. (2d) 615, at page 255, it is stated:

"It is universally recognized that the testimony of an accomplice is fraught with weaknesses, due to the effect of motives, hope of leniency or benefits, or the effect of fear, threats, hostility, etc."

This was a first degree murder trial with the very life of the defendant in the balance. The record shows Davis a depraved person and Mrs. Buchanan a lawless person, and the testimony of each impeached. Should testimony, from such individuals, bearing directly upon the guilt of the defendant be accepted as true? We think not. The conviction of a person charged with first degree murder should not rest on evidence so fraught with doubt. Falsus in uno, falsus in omnibus.

Milam's testimony, in contrast, was unimpeached with respect to the essentials. Detective Brewer, a witness for the state, testified that he "could not doubt or refute anything" told him by Milam and Detective Bruce that Milam made no misstatement to him.

In Sorgen v. State, 36 Oh Ap 281, 172 N. E. 835, syllabus one states:

"Law presumes that witness is relating truth and not falsehood, and court or jury cannot start with assumption of suspicion of falsehood."

The record as to the robbery itself, therefore, seems to show that Milam took no part in tying up the Buchanans or stealing their personal valuables and was a mere spectator, standing like one transfixed, during the violence perpetrated upon the Buchanans in the basement, and only did what he was told to do, by one or the other of his evil companions in the final stages of the holdup, in carrying the whiskey, the .32 caliber revolver and the bag of money.

With respect to the episode in the Cadillac, Milam testified that on opening the door to his automobile he took the .32 caliber revolver out of his pocket and threw it with the bag of money on the floor of the front seat, saying he didn't want anything to do with it and then said to Davis, "You told me that there wasn't going to be any trouble and now you have took this from him," and that Davis said, "No, but you did keep a cool head," and Lyons said, "If you had got excited, we would have tied you up with the others."

The police found $265 with a rubber band around it, a watch and the .32 caliber revolver under the seat on the passenger's side. The bag of money contained $49.20 in coin, a one dollar bill and a ring. Milam had $1.00 on his person.

The fact is, that when the police siren sounded he stopped the car, despite the fact that he was urged to keep on going. And when Lieutenant Lentz lay mortally wounded on the ground and when every other person had departed, he alone remained on the scene.

The record shows, also, that he cooperated to the fullest extent with the police and helped them in every way possible: he told the police the directions Davis and Lyons took, pointed out Davis' home. picked Lyons out of a lineup in police headquarters, and made a forthright, though confusing, statement to the police, freely relating all that he knew about the entire matter, including his part in it.

Did these facts and circumstanes warrant a finding "that he, defendant Milam, voluntarily joined in and became a party to the conspiracy and the common purpose to rob the Buchanans as was then in progress; that he did so voluntarily without any coercion or duress." as found by the trial judges?

Unfortunately, we cannot look into a person's mind and see his "state of mind." The best that can be done is to consider all the facts and circumstances surrounding the situation in which a person is involved together with his acts and statements in the matter and from such information determine what probably were the motivating reasons for his acts.

The record to us portrays Milam as a guileless tyro of metropolitan life who unwittingly associated himself with some evil characters. He had no criminal record (when twelve years of age he was in trouble for stealing tennis rackets) and never in his life owned or fired a revolver. His life with his family in West Virginia had been that of an average boy raised on a farm. He had attended school and had worked on various farms during his spare time. His employment record at the Ford Motor Company was exemplary. Is it probable that a young man with such a past would intentionally become a party to an armed robbery at the flick of a whip? Moran v. State, 11 C. C. 464; Andrews v. State, 15 C. C. (N. S.) 241.

As we view the record, Davis tricked Milam into accompanying him and Lyons to the Buchanans' home on that fateful morning. He had conceived the diabolical scheme of robbing the Buchanans of monies he knew they had accumulated through gambling with marked cards. He needed Milam as a decoy to get them into the basement of their home

for the robbery. He also needed Milam's automobile for a quick getaway. And naive Milam, wholly unsuspecting any such designs on the part of Davis, fell into the trap. When Davis, then, staged the holdup, Milam, entirely surprised, was petrified with fear. His own safety was uppermost in his mind. That is why he asked Davis if he could "get around behind him." Participating in the robbery was farthest from his thoughts as he stood behind Davis, saying nothing and doing nothing. Under those bizarre circumstances, we believe that it was reasonable for him to fear that he was in imminent danger of death or great bodily injury at the hands of such vicious characters if he attempted to leave the place or refused to do anything that they told him to do, and that he did no more than what he believed was necessary to do to ward off any suspicion that he was antagonistic to their desires and unwilling to cooperate.

To us, therefore, the record tends to show that the defendant did not participate in the robbery of his own volition but because of a well-grounded apprehension of present, imminent, and impending death or serious bodily injury at the hands of these men if he did not; that it was reasonable for him to believe that he could not avoid participation in the robbery without immediate exposure to death or great bodily injury; that he seized the first opportunity reasonably safe for him to desist from such participation; and that he refused to escape, when opportunity offered, from no consciousness of wrongdoing.

The law permits the inference that a person fleeing from crime does so out of a consciousness of guilt. The law should likewise permit the inference that a person refusing to flee from crime, though opportunity offers, does so because of no consciousness of guilt. 2 Wigmore on Evidence (3rd Ed.) Section 276; 12 O. Jur., Criminal Law, 320, Section 313, and cases cited.

Where an eighteen-year old youth with a wholesome background of family life on a farm, eleven years of schooling and no criminal record, comes to a large industrial city and obtains employment in a factory where his conduct is exemplary, is tricked by a chance acquaintance, twelve years his senior, into accompanying him and a total stranger to the home of a man and wife, who engage in the unlawful sale of liquor and gambling, at 3:30 in the morning, on the pretext of asking for the return of money the minor had lost gambling there two nights before and with the understanding that there will be no trouble or violence, but in truth and in fact for the dual purpose of creating a plausible excuse to gain entrance into the home for the perpetration of an armed robbery and of obtaining the use of the minor's automobile for a quick getaway thereafter, and the minor knows nothing of such plans or the fact that his acquaintance has a loaded revolver on his person, and when in the home, the villain suddenly and unexpectedly draws the revolver to rob the place and the men tie up the couple and strip them of their personal valuables and the minor, thoroughly frightened, stands watching the violence and takes no part in it whatever, and the villain holds the revolver in his hand throughout the activities and in the last stages of the proceedings tells the minor to carry a bottle of whiskey and a bag of money, and the confederate,

who also has a .38 caliber revolver on his person taken from the premises, tells him to carry a .32 caliber revolver found in the bedroom, which the minor puts in his pocket, and when the three enter the automobile for the getaway the minor throws the revolver and the bag of money on the floor and says he wants nothing to do with it, and is told by the men that he would have been tied up, too, if he had not gone along with them and, after the automobile starts up with the minor behind the wheel, the siren of a police car sounds directly back of the automobile and the minor, though ordered to go on by one of the men, stops the automobile and a police officer comes to the driver's side of the automobile and tells the three to wait, returns to the police car to radio for help and then, again, comes to the minor's automobile with the man who was robbed and removes the keys to the automobile and appropriates the bag of money and informs the men that they are under arrest, and the minor submits completely to the authority and control of the police officer but the two men argue and shout at their accuser, and one of the men attempts to get out of the automobile on two occasions and is ordered to remain by the police officer but on a third occasion gets out of the automobile with a revolver in his hand to face his accuser and, upon being ordered to return by the police officer, deliberately and purposely shoots the police officer and the two men escape but the minor remains and is found minutes later by other police officers, sitting behind the wheel, crying, and the minor willingly submits to the police and cooperates with them and aids them in apprehending the two men and makes a statement freely relating all, including his part, that he knows about the events, an affirmative defense of coercion and duress to the robbery appears made out by the minor, and his participation in the robbery excused, and a judgment adjudging the minor guilty of murder in the first degree with a recommendation of mercy is manifestly against the weight of the evidence and prejudicially erroneous to him.

The record is conclusive that Milam played no active part whatever in the automobile episode which led to the tragic shooting of Lieutenant Edward Lentz, submitting entirely to the authority and control of the officer. The trial court found him guilty of murder on the theory that he had aided and abetted the robbery, was equally guilty with Davis and Lyons in perpetrating the same, and that the three men were "in flight from the scene of the robbery, and while asporting the proceeds, or loot, of the robbery, and before reaching a haven of safety and security, and before any division of the loot had been effected, as part of the res gestae, one of the co-conspirators, while in the perpetration of the robbery, purposefully and maliciously killed Edward Lentz * * *."

The three judges, obviously, came to the conclusion, as pointed out by Hurd, P. J. in his concurring opinion, that the robbery as a matter of law was still in progress and that the participants were accountable to the law for any acts committed in its furtherance until its termination. However, in our opinion, the record discloses a factual situation from which reasonable minds may come to different conclusions as to whether or not the robbery, at the time of the murder, was at

an end. One conclusion may well be that an intervening event intruded into the continuity of the robbery and terminated it and that an entirely new episode was inaugurated involving Davis and Lyons but not Milam. Arrest of the three men would be such an intervening event. The conclusions of fact of the trial judges show that that phase of the evidence was not considered and passed on.

"The word (arrest) is 'derived from the French, arreter, to stop or stay, and signifies a restraint of a man's person; depriving him of his own will and liberty, and binding him to become obedient to the will of the law. It is called the beginning of imprisonment.' Legrand v. Bedinger, 4 T. B. Mon. (Ky.) 539, 540 (5 C. J. 385)."

It is also stated in Central of Georgia Ry. Co. v. Carlock, 196 Ala. 659, 72 So. 261, in syllabus five:

"An arrest may be made without actual force, or without touching the body; it is sufficient if the party arrested is within the power of the officer, and submits to arrest even as the result of a verbal command." and in State v. District Court, 70 Mont. 378, 225 P. 1000, it is stated:

"To constitute an 'arrest,' four requisites are involved: A purpose to take the person into custody of the law, under real or pretended authority and an actual or constructive seizure or detention of his person, so understood by the person arrested."

See, Melton v. State, Fla. 75 So. (2d) 291; Thompson v. Boston Pub. Co., 285 Mass. 344, 189 N. E. 210; Gold v. Bissell, 1 Wendell's Reports (N. Y. 1828) 210, 215; Davis & Allcott Co. v. Boozer, 215 Ala. 116, 110 So. 28; Martin v. Houck, 141 N. C. 317, 54 S. E. 291; Long v. Ansell, 69 Fed. (2d) 386, 389, 63 App. D. C. 68, 94 A. L. R. 1466; Price v. U. S., 119 A. (2d) 718; 6 Corpus Juris Secundum, 570; 5 Corpus Juris, 385, Section 2; 4 American Jurisprudence, 5, 6.

The question whether the robbery was still continuing or ended when the homicide occurred was for the triers of the facts to determine in the light of the happenings subsequent to the stopping of the escape automobile by Lieutenant Lentz, and, not to have passed on the question was error prejudicial to the substantial rights of the defendant.

"In practically all jurisdictions, the question whether a particular act was done during the continuance and in furtherance of the common design is held for the jury." 18 Cornell Law Quarterly, 439, 440.

It is stated by the court of appeals of the state of New York in People v. Smith, 232 N. Y. 239, 133 N. E. 574, in syllabus two:

"Where, upon trial of an indictment for murder in the first degree, alleged to have been committed by defendant while attempting to escape from a store which he had broken into under circumstances which constituted the crime of burglary in the third degree, the evidence warrants the view that acts performed by the proprietor and his son in apprehending, searching and handcuffing the defendant were sufficient to constitute an arrest and that thereafter defendant performed no further acts in continuance of his original crime of burglary, it should not have been held, as matter of law, that the defendant was still engaged in the crime of burglary when the homicide occurred, but it should have been submitted to the jury to decide whether the commission of this crime has been terminated."

See People v. Walsh, 262 N. Y. 140, 186 N. E. 422.

Accordingly, the judgment entered in the Court of Common Pleas of Cuyahoga County in this case is reversed and the cause remanded for further proceedings according to law.

HURD, PJ, concurs (see concurring opinion).

SKEEL, J, dissents (see dissenting opinion).

## CONCURRING OPINION

By HURD, PJ.

I concur in the foregoing opinion of Kovachy, J., and in the judgment of reversal on the ground that under the facts and circumstances, as shown by the record, the judgment of guilty of murder in the first degree is contrary to the manifest weight of the evidence. The findings of fact of the trial court, to which I wish particularly to direct attention, are contained in paragraphs one and four which read as follows:

1. "It is clear to the Court that the evidence does not disclose beyond a reasonable doubt that the defendant, Dallas Milam, went to the Buchanan home with Davis and Lyons on the morning of December 9th, with any preconceived plan or design, or conspiracy, to precipitate a robbery.

4. "The evidence further discloses beyond a reasonable doubt that while in flight from the scene of the robbery, and while asporting the proceeds, or loot, of the robbery, and before reaching a haven of safety and security, and before any division of the loot had been affected, and as part of the res gestae, one of the co-conspirators, while in the perpetration of the robbery, purposefully and maliciously killed Edward G. Lentz, a duly appointed, qualified, and acting police officer of the City of Cleveland while said police officer was in the discharge of his duties as a police officer."

While the finding in paragraph one above is in Milam's favor as far as it goes, it does not go far enough because it does not clearly and objectively appraise the evidence. A careful examination of the record shows that there is **absolutely no evidence** that defendant Milam had **any preconceived plan, design or conspiracy to commit a robbery.** On the contrary, the evidence shows positively that Milam, an inexperienced young man of the age of eighteen years, was the innocent victim of the machinations of two evil men, Davis and Lyons, on mischief bent, who tricked him into accompanying them on the pretense of having a peaceful discussion with one, Alonzo Buchanan. Their stated purpose was to induce Buchanan voluntarily to return to them money which they had lost to him in gambling. They awakened Milam out of a sound sleep at 3:30 A. M. on the morning of December 9th, stating in substance that they had just discovered that Buchanan, by the use of marked cards, had cheated them out of money that night, and that the money which Buchanan had won from Milam when he had been taken to Buchanan's home by Davis a few nights before had been procured by the same nefarious means. They assured Milam that if he

would drive them in his car to Buchanan's home, there would be no trouble of any kind and no violence, and Davis, in particular, assured him that he knew from past experience that Buchanan would willingly return the money which he had gained from them by cheating upon being confronted by them with the evidence of this fact.

The evidence clearly shows that Milam did not know that Davis was armed, or that Davis theretofore had been acting as a shill or confederate in crime with Buchanan, or that Davis, who had first taken him to Buchanan's home a few nights before, had shared in the money which Buchanan had won from Milam on that occasion. Milam did not know that Davis intended to turn upon his confederate, Buchanan, and intended to enforce his demands at the point of a gun. This evidence is extremely important, as it clearly shows that Milam positively was not a prior co-conspirator with Davis and Lyons in what occurred in the early hours of the morning at the Buchanan home.

Referring to the findings of fact as contained in paragraph four above, it is obvious that the language therein is taken almost verbatim from the case of **State of Ohio v. Habig, 106 Oh St 151,** 140 N. E. 195. An examination of the Habig case clearly shows a set of facts entirely distinguishable from the facts of the instant case. In the Habig case, the evidence shows that Habig and two of his companions were prior co-conspirators. When they had some difficulty with one of their victims, they started to flee, taking the proceeds of the robbery with them. One of the victims called the police, who immediately set out in pursuit of the robbers. Patrolman Dyke was in the lead and intercepted the robbers, and when he ordered them to stop, was fatally shot by Habig. The shooting occurred in hot pursuit and without **any surrender by Habig or either of his two companions.** Habig was indicted for murder in the first degree. Upon trial the court found that the evidence did not sustain the first count of the indictment of premeditated malice but did sustain the second count—namely, murder in the commission of a robbery, and in doing so, used language similar to that quoted above in paragraph four of the findings of the trial court.

The Habig case approved and followed **Conrad v. State, 75 Oh St 52,** 78 N. E. 957. Without detailing the facts of that case, we call attention to paragraph two of the syllabus which reads:

"2. Where one starts to carry out the purpose to commit a rape, arson, robbery or burglary, and kills another under circumstances so closely connected with the crime which he has undertaken as to be a part of the res gestae thereof, he is guilty of murder in the first degree, within the meaning of §6808 **R. S.,** whether the crime which he originally undertook has been technically completed or not."

How different are the facts in the instant case. In the first place, as previously noted, Milam was not a prior co-conspirator; and second, according to the undisputed evidence, Milam surrendered to the police officer at the first opportunity afforded him by stopping his car immediately upon being signaled so to do. Furthermore, at no time did Milam disobey the orders of Officer Lentz, but on the contrary, obeyed every order of the officer, remained submissive, and accepted

arrest willingly and without hesitancy. The evidence also shows that he stopped his car against the desperate urgings of Davis and Lyons to keep on going and not only surrendered himself to the police officer, but, by his act, in cooperating with Officer Lentz, delivered both Lyons and Davis into his custody.

The evidence further shows that Lyons and Davis also submitted to the jurisdiction of the police officer for a period of time sufficient to enable Officer Lentz to order them to remain seated in the car while he went back to the police car and put in a call for assistance. The evidence shows that they obeyed this order. The evidence also shows that thereafter, Officer Lentz returned to the car, opened the door on the driver's side where Milam was seated, reached in, removed the keys from the ignition lock and, according to Milam, told them they were under arrest. It was after all three were under the jurisdiction of the police officer that Lyons attempted, at least three times, to get out of the car on the passenger side and at least twice obeyed the command of Officer Lentz to stay in the car. It was not until the third time that Lyons got out of the car that he went to the rear of the car, and then, without any provocation, wantonly, maliciously and unexpectedly fired at Officer Lentz, causing his death, for which Lyons is now under sentence of death, this court having affirmed a judgment of guilty of murder in the first degree entered in the Court of Common Pleas. When Lyons fired the fatal shot, Davis took advantage of this opportunity to attempt to escape along with Lyons.

In the meantime, Milam again made no attempt to escape although urged to by Davis, but instead remained at the wheel of the car where he was found crying when the other officers arrived on the scene. When he saw the other officers, he directed them to where Officer Lentz was lying on the ground by saying—over here officer, someone has been hurt —or words to that effect. Thereafter, he cooperated with the police in locating Davis, and in all other respects. Also, he refused to testify in favor of Lyons or Davis.

The evidence warrants the view that the acts performed by Milam in stopping his car and in surrendering himself to the custody of Officer Lentz and at the same time, delivering Davis and Lyons to the custody of the police officer for an appreciable period was sufficient to show a break in the continuity of events and an intervening episode between the robbery and the homicide, by reason of which it should not be held as a matter of law under the principle of the Habig and Conrad cases, that the defendant was guilty of murder in the first degree.

This is especially true since Milam was not a prior co-conspirator, had no intention to commit a robbery but was present on the scene only because of false and fraudulent representations of Davis and Lyons, was under duress while in the Buchanan household, as shown in the opinion of Kovachy, J., and at all times submitted to the officer, obeying his commands in all respects, and in refusing to escape after the homicide although urged by Davis to do so. Furthermore, the evidence tends to show a complete lack of any felonious intent on Milam's part because he had no knowledge of the crime intended and perpetrated by Davis and Lyons in the robbery of Buchanan.

The only basis upon which Milam could be held to answer for the crime of Lyons and Davis would be as an aider and abettor since whoever aids, abets, or procures another to commit an offense may be prosecuted as a principal. To hold under the evidence, as shown in this case, that Milam conspired to commit a felony or that he purposefully aided or abetted the slayer, is, in our opinion, contrary to the manifest weight of the evidence.

The State also places some reliance upon the case of Commonwealth v. Doris, 287 Pa. 547, 135 Atl. 313, also discussed in the dissenting opinion. The Doris case must be distinguished from the instant case on the facts. It is inapplicable here because Doris, with four others, formed a conspiracy to rob a bank messenger. Doris was one of the group of conspirators. In escaping with the stolen property, they were obliged to abandon both the car and the loot. They fled together on foot but kept up a running fire upon the officers. Doris was one of those who kept firing while fleeing, thus indicating his murderous intent and although an officer was killed after Doris was wounded and captured, nevertheless Doris was properly found guilty of murder as the result of the death of the officer. The many factual differences between the two cases are too obvious to require further discussion.

It is worthy of observation that the Habig, Conrad and Doris cases, supra, as well as all other cases cited and relied upon by the State, have one thing in common by reason of which they must be distinguished from the instant case. In all of these cases, the defendants had a felonious intent in their conspiracy to commit the crime of robbery, burglary or other felony. In the case at bar, all the evidence tends to negative a felonious intent on the part of the defendant. Here we have a young man, quite immature and guileless, who was innocently tricked into a web of circumstances by hardened criminals, from which he attempted to extricate himself at the first opportunity which afforded him any degree of safety.

While we do not find any authoritative decisions in Ohio factually analogous to the instant case, certain cases in other jurisdictions may throw some light on the subject, although the fact situation here presented is so unusual and extraordinary that we doubt if there are any other cases directly in point.

In Patton v. Commonwealth, 289 Ky. 771, 160 S. W. 2d 180, it was held, as appears by the second and third paragraphs of the syllabus:

"2. To constitute one guilty of 'aiding and abetting' in the commission of a crime, it is essential that evidence be introduced to show a plan or concert of action in its commission or to show that the accused by overt act or pronouncement has encouraged, assisted or procured the principal to commit the unlawful act, and one's mere presence at the scene of the murder is not sufficient proof of an 'unlawful' act to submit the issue of aiding and abetting to the jury.

"3. Where defendant got out of automobile with his hands up and did not participate in or encourage attack on officer made by defendant's brother, and made no attempt to escape after fatal shooting of officer,

although he could have done so, court properly refused to instruct jury on count charging that defendant had 'aided or abetted' his brother in the commission of the crime."

To the same general effect, see the earlier case of Whitt v. Commonwealth, 221 Ky. 490, 298 S. W. 1101.

Coming now briefly to consider the motion for new trial. It appears that evidence was presented to the court that Lyons from his place in the death row in the Ohio Penitentiary made a statement which repudiated certain of his testimony given in the trial of his own cause with respect to Milam. This testimony, coming in the shadow of impending death, when it could be of no benefit or advantage to Lyons, should have been given more serious consideration by the court because it exonerated Milam from complicity either as a co-conspirator or as an accomplice in the robbery and supported the view that Milam was so frightened that "he was shaking in his boots while in the Buchanan home." This, together with the fact that the evidence given by Davis at the trial, was completely at variance with the evidence given by the trusty in the jail in respect to what Davis told him about the case, would also tend to exonerate Milam and should have been sufficient to cause the court to re-examine the entire case with a view to granting the motion for new trial which, in our opinion, in the light of all the evidence, unquestionably should have been granted.

In conclusion, it is important to observe that the bill of exceptions in this case consists of 741 pages. It is obvious, therefore, that extended quotations of testimony, taken out of context, as appears in the dissenting opinion, cannot alone form the basis of a judgment of the entire case on its merits. It should also be observed that the testimony of four defense witnesses was stipulated as to material facts in the case, a practice which should not be indulged in a first degree murder case. The presence of witnesses on the witness stand is highly important in determining their credibility and the weight to be given to their testimony. A complete appraisal of the evidence forces the conviction that in this case the defendant was unwittingly dragooned into a situation of peril so great and under such peculiar circumstances, which developed so rapidly and unexpectedly, and over which he had no control, which should question any felonious intent on his part.

In this case an officer of the law was shot down in the performance of his duty—a heinous offense which must be deeply deplored. It is important to the people of the State of Ohio that the guilty in such case should be punished to the full extent of the law. It is equally important to the people of the State of Ohio that the proceedings in such case be in strict accordance with the rules of law.

I concur in the judgment of reversal because upon an examination of the entire case, it clearly appears that the judgment of the trial court is manifestly against the weight of the evidence and requires a reversal and a new trial under the rule laid down by the Supreme Court in the two cases of **State of Ohio v. Robinson, 161 Oh St 213, and 162 Oh St 486.**

## DISSENTING OPINION

By SKEEL, J.

I am unable to concur in either of the opinions of the majority of the court or the judgment of reversal which remands the case for retrial on the ground that the judgment is against the weight, or not supported by sufficient evidence.

The charges, as set out in the indictment, the judgment of the three judge trial court, and the sentence imposed, have been completely outlined in the majority opinions and need not be repeated. A statement of the essential facts, and some of the evidence, however, seem necessary in the light of the conclusions reached by the majority of this court with which I cannot concur, and the outline of which will tend to explain the basis of this opinion.

The deceased, a Lieutenant of the Police Department (Edward G. Lentz) was shot and killed by one, Robert Lee Lyons, at about 4:30 A. M., in front of 6203 Quimby Avenue in the City of Cleveland on the 9th of December, 1957. Lyons, with one Davis and this defendant, had been together beginning about 3:30 A. M. of that day when Lyons and Davis called at the home of this defendant at 1516 East 55th Street and requested him to drive them to the home of Alonzo Buchanan at 5616 Quimby Avenue to seek the return of some gambling losses claimed by all three men, said losses, it was claimed by Davis, had come about because Buchanan had used marked cards. The evidence tends to show that this defendant was taken to the home of Buchanan early in the morning of the 6th of December (2:00 A. M.) where he lost about $40.00 in a card game. Davis claimed a much larger loss and that he had discovered, either on the 8th or 9th of December, that marked cards had been used. The defendant insists that when he left his home at 3:30 A. M., December 9th, with Davis and Lyons, he was assured there would be no trouble or violence in getting the money back and that he did not know Davis had a gun. There is some supporting testimony to this claim. Whether or not one could rely or would be justified in relying on a statement that a known gambler could be expected to give up winnings on a claim of marked cards is open to considerable doubt. There can be no doubt but that Buchanan was a gambler; that his basement room was fitted out for gambling; also, there is some evidence that this defendant did sustain a gambling loss in the early morning hours of the 6th of December, while playing poker with Buchanan and others in the basement of Buchanan's home.

After Davis, accompanied by Lyons, made his assurances to this defendant that they could retrieve their gambling losses without trouble or violence of any kind, the defendant drove Davis and Lyons to the Buchanan home on Quimby. As they arrived, Buchanan was also just returning to his home. His explanation of his whereabouts just prior to 3:40 A. M. of December 9th was that he was visiting a girlfriend on East 61st Street. His wife, who was then home fully dressed, did not go with him on the visit. The testimony of Davis, now serving a life sentence in connection with his part in the murder of Lieutenant Lentz, was that he was an agent of Buchanan's, seeking out customers to participate in

gambling in Buchanan's basement. He said he had induced this defendant to visit Buchanan on the 6th of December and had received $10.00 of the $35.00 or $40.00 lost by Milam on that day. Davis testified that Buchanan wanted Davis to get Milam to return for a session of gambling on the morning of the 9th and that Buchanan had driven him over to Milam's residence in furtherance of such purpose. The implication from such testimony is that when Davis, Lyons, and Milam met Buchanan as he entered his home at about 3:40 A. M., he was just returning from the foregoing mission. As the four men entered Buchanan's home, Mrs. Buchanan was in the living room, and as above indicated, fully dressed. The four men went almost immediately to the basement and the wife followed a few minutes later. The only testimony that anything was said about returning money lost by the use of marked cards was that of this defendant. His testimony concerns only his money and no mention was made by him of the money said to have been lost by Davis and Lyons. Within a few minutes after all of the participating parties were either seated or standing around a round table, which was a part of the furnishings of the room, Davis pulled a gun, pointed it at Buchanan, and demanded money. Buchanan testified in part:

"The WITNESS: I say, we were there about four or five minutes and that is when Davis pulled his gun.

"* * *

"Q. What, if anything, did he say at that time?

"A. Well, he says to me, he says, 'This is it,' and I told him, I said, 'Are you kidding?' He said, 'No, I'm real,' you know. That's what he said, so I thought he was kidding.

"Q. All right. After he said, 'This is it,' or, 'This is'—whatever else he said—what took place then?

"A. Well, he asked me for the money, you know.

"Q. Well, exactly what did he say?

"A. Well, he said, 'This is it.'

"Q. Yes.

"A. I said, 'What do you mean?'

"He says, 'This is for real.'

"I said, 'Are you kidding?'

"He said, 'No, I am not kidding.'

"He said he wasn't kidding, so he asked me for my money and, you know.

"Q. No, I don't know. You said, 'You know.'

"A. Well, he told me to keep my hands on the table. I know that. I was standing up, and he told me, you know, to keep my hands on the table."

The defendant's testimony as to what took place in the basement was, in part, as follows:

"Q. Now, sir, when all of you were in the basement, what, if any conversation, to the best of your recollection, occurred at that time?

"A. James Davis got up and walked to the table and told Alonzo Buchanan that he wanted my money back and said—give this man his money back, and he pointed toward me.

"Q. Did James Davis tell Alonzo Buchanan why you were entitled to have your money back?

"A. Yes, sir; he did.

"Q. What did he tell him?

"A. He said that Robert and him had caught Alonzo Buchanan using marked cards and cheated me out of my money, and wanted it back.

"* * *

"Q. Now, sir, at this point—up to this time, had any weapon been shown by any person in that basement?

"A. No, sir.

"Q. All right. What happened if anything, after Davis told Buchanan that he wanted Buchanan to return to you the money that you had been cheated out of?

"A. Buchanan said to Davis that he would send Ruth upstairs to get it.

"Q. Referring to Ruth, who is Ruth?

"A. Mrs. Buchanan, sir.

"Q. All right.

"And after Alonzo Buchanan told Davis he would send his wife to get it, what, if anything, occurred?

"A. Davis pulled out his gun.

"Q. Now, at any time prior to the time that Davis pulled out a gun, at this moment, did you, sir, have any knowledge or inkling that there was a gun in Davis' possession?

"A. No, sir; I did not.

"Q. Now, when Davis pulled out the gun, where were you?

"A. I was still sitting in the chair.

"Q. And where was Alonzo Buchanan?

"A. Standing beside me.

"Q. And you have already described that as a distance of six inches to 12 inches; is that correct?

"A. That is right, sir.

"Q. In what direction did Davis point the pistol?

"A. Directly at Alonzo Buchanan.

"* * *

"Q. When the gun was pointed at Buchanan, what, sir, did you do?

"A. Well, I got scared and I asked Davis if I could get around behind him.

"Q. And did you?

"A. Yes, sir; I did.

"Q. Now, sir, you walked around behind Davis; is that correct?

"A. Yes, sir.

"Q. Now, sir, what, if anything, happened after that?

"A. Well, he told Alonzo and Ruth Buchanan to get out on the floor. Wait a minute. I am getting ahead of myself. When he pulled out the gun and told Ruth Buchanan that she would not go anywhere and that she should tell him where the money was, and he would send Robert Lyons to get it.

"Q. And did Ruth Buchanan tell Davis where the money was?

"A. Yes, sir.

"Q. And where were you at this time?

"A. Behind Davis, sir.

"* * *

"Q. And then what, if anything, did James Davis, or anyone, do?

"A. James Davis sent Robert Lyons upstairs to get the money, and told Alonzo and Ruth Buchanan to get down on the floor.

"Q. And did Alonzo and Ruth Buchanan get down on the floor?

"A. Yes, sir.

"Q. And in what position were they on the floor?

"A. Face down, sir.

"* * *

"Q. Now, sir, after they lay on the floor and James Davis had sent Lyons up, what, if anything, happened?

"A. Well, at the time that Adonzo and Ruth Buchanan lay down on the floor, - - by the time they lay down on the floor, Lyons came back.

"Q. Lyons came back?

"A. Yes, sir.

"Q. And did he have anything with him?

"A. Yes, sir.

"Q. What did he have?

"A. A bag of money, sir."

After Lyons returned with the bag of money, Davis emptied the bag on the table and started to count it. Buchanan told him there was between $400 and $500 there, so, without finishing the count, the money was returned to the bag. Davis then directed Lyons to tear strips from a bedspread on the couch with which they tied the Buchanans as they laid face down on the floor. While thus immobilized, Lyons and Davis took the Buchanans' watches which they were wearing and also a ring from Mr. Buchanan's finger, which property was put in the bag with the money.

The defendant testified further that Davis directed Lyons to search further for money, that he discovered a .38 caliber revolver in Buchanan's bedroom and a strong box in Buchanan's bedroom closet, which Lyons brought to the basement. The strong box, when forced open with the use of the gun barrel, disclosed nothing of value. All three then went upstairs to look for $100 bills. The defendant claims that although he went along, he took no part in the search. Two more revolvers were uncovered. Lyons offered the larger of the two (a .38 caliber) to this defendant, which he refused. He, however, took the ".32" and put it in his pocket. The defendant then took the bag of money from Lyons at Lyon's request, left the Buchanan house, and got into the defendant's Cadillac, the defendant in the driver's seat, Davis in the middle of the front seat, and Lyons on the passenger's side of the front seat. The defendant, after putting the money bag and the .32 caliber revolver on the floor, started to drive east. The defendant testified as they drove away that he told Davis:

"Well, I told James Davis that I didn't want anything to do with that

(referring to the money). I said, 'you told me that there wasn't going to be any trouble and now you have took this from him.' "

After Davis, Lyons, and this defendant left the basement, Buchanan worked himself loose, climbed out a basement window and ran to call the police. While in the act of calling at a corner phone booth, Lieutenant Lentz drove in sight at the corner of East 55th and Quimby. Buchanan called him for help, got into the police car and started east on Quimby just as the defendant started the Cadillac from the curb. After proceeding about a block or a little more, upon the sound of the police siren, the defendant stopped in the middle of the street in front of 6203 Quimby and the police car stopped about 10 feet to the rear of the Cadillac. Lieutenant Lentz got out of the police car, walked forward to the driver's side of the Cadillac, and said to all three that "this man (Buchanan) tells me you robbed him," and ordered all three to remain in the car. Lieutenant Lentz then returned to the police car, used the police radio, and then both he and Buchanan returned to the Cadillac, Buchanan stopped near the rear. The Lieutenant went to and opened the door on the driver's side of the Cadillac, took the keys from the ignition, and directed all three to stay in the car, saying they were under arrest. Lyons tried on two or three occasions to leave the car, but yielded to the Lieutenant's directions and remained seated. But, finally, he got out, went to the back of the Cadillac, drew a gun, first on Buchanan, and then pointed it directly at Lieutenant Lentz who had just taken possession of the money bag. The first shot felled the Lieutenant, but Lyons fired a second shot while he lay on the ground. Davis made his escape at about the time the shots were fired but this defendant remained seated for two or three minutes until after other police officers arrived and took him in custody.

A reference to the defendant's statement to the police, made voluntarily, within a few hours after the death of Lieutenant Lentz will be considered later but here it must be noted that there is not the slightest suggestion in his statement that he was compelled to comply with any order and command of the co-defendants by threat of bodily harm or fear based upon a threat of violence if he did not go along with their purpose or should attempt to leave the unlawful enterprise. He explained the trip upstairs to search for money, which is relied upon as exemplifying duress, as set out by him in his statement as follows:

"So the three of us started upstairs and so Jimmy (Davis) asked me if I wanted a drink and I told him, yeh, that I would take one, so we walked back in the corner where they had the whiskey. We all three took a drink and took one bottle with us. We went upstairs and went through one room, we searched the room and after searching the room, we left."

The court's conclusions of fact are as follows:

"1. It is clear to the court that the evidence does not disclose beyond a reasonable doubt that the defendant, Dallas Milam, went to the Buchanan home with Davis and Lyons on the morning of December 9, with any preconceived plan or design, or conspiracy, to precipitate a robbery.

"2. The evidence does disclose, however, beyond reasonable doubt that Davis and Lyons began to precipitate a robbery upon the Buchanans in the presence of the defendant, Milam; and that he, defendant Milam, voluntarily joined in and became a party to the conspiracy and the common purpose to rob the Buchanans as was then in progress; that he did so voluntarily without any coercion or duress. * * *

"3. The evidence further discloses beyond a reasonable doubt that while in flight from the scene of the robbery, and while asporting the proceeds, or loot, of the robbery, and before reaching a haven of safety and security, and before any division of the loot had been effected, and as part of the res gestae, one of the co-conspirators, while in the perpetration of the robbery, purposefully and maliciously killed Edward G. Lentz, a duly appointed, qualified, and acting police officer of the City of Cleveland while said police officer was in the discharge of his duties as a police officer.

"* * *"

The record clearly supports the court's first conclusion of fact that insofar as this defendant is concerned, his visit to the Buchanan home in the early hours of December 9, 1957, was not in furtherance of a conspiracy to rob. The uncontroverted evidence of the defendant is to that effect, and the state makes no contrary claim.

The second conclusion of fact is also justified by the record, that is, after Lyons and Davis started to commit their unlawful acts of taking property (money and jewelry) from the respective persons of the Buchanans by force and by putting them in fear (at the point of a gun), Milam, somewhat reluctantly, but certainly not under duress, gave assistance in carrying out such unlawful conspiracy. His own evidence attempts to show that he, in fact, took no part in the robbery, but such testimony is controverted by both Buchanans and by Davis and, in part, by his own admissions as to his conduct under the circumstances. It is equally clear that he made no effort to leave when the violence started and followed along with Davis and Lyons during the final search of the premises, and in fact, carried the money bag and a stolen revolver out of Buchanan's house to his automobile upon leaving, and from that point until the time of arrest, was driving his companions from the scene of the crime. Duress, as a defense, is affirmative in character requiring a defendant who claims to have acted under duress to establish that claim by the greater weight of the evidence. Such claim is, in effect, a confession and avoidance. The law of Ohio was clearly determined on that question in the case of **State v. Sappienza, 84 Oh St 63,** 95 N. E. 381. The syllabus provides:

"Where, in the trial of an indictment for robbery, it is proved beyond a reasonable doubt, that the defendant was present at the time and place of the crime and participated in the acts which constituted the robbery, and the defendant, for his defense, interposes a plea of duress, the burden is not on the state to disprove such plea, but is on the defendant to maintain his plea by a preponderance of the evidence."

The facts in the Sappienza case are distinguishable from the present case only in the following respects. In that case the defendant was a

co-conspirator from the beginning. Here the defendant had not agreed to take part in a robbery but was actually on hand with the conspirators under a misapprehension of fact. It is also true that in the Sappienza case the defendant claimed to have announced his withdrawal from the conspiracy before any direct act to carry the plan into effect had taken place, and from that point on, he claims to have acted in fear of his life because of the threats at gun point of his co-conspirators. Here the defendant did not utter a word of withdrawal after the intention of Davis and Lyons to rob the Buchanans was clear. At no place in the evidence does the defendant say or act in such a way or fashion as to indicate a withdrawal of support from the robbery, nor is there any evidence that his co-conspirators threatened his physical safety if he attempted a withdrawal. The court's conclusion that this defendant actually took part in the robbery is supported by credible evidence and the surrounding circumstances.

The claim that this defendant acted in fear (which is not a legal defense) is almost completely destroyed by his own testimony and police statement. As quoted above, he said that when searching for money, Lyons found two loaded revolvers, one a .38 and one a .32. He offered the .38 to the defendant, which was refused, but the defendant did take the .32. It would be somewhat unusual for Davis and Lyons to arm the defendant if he were, in fact, under duress. The duress theory is likewise severely challenged by the following statement of the defendant, made to the police, as follows:

"We got in my car and drove about a half block and we heard the siren behind us and I started to stop and Jimmy said, keep going, but I went ahead and stopped the car and this officer came up and asked us what we had been doing."

The defendant gave substantially the same statement when testifying as quoted above. He seemed not to have been concerned with Jimmy's commands under circumstances far more likely to put him in danger of physical injury than at any other time during the robbery. The defense of duress is not presented in this case and fear, as a result of one's own mental temperment, is not a legal defense.

By the third finding of fact, as quoted above, the trial court found that the killing of Lieutenant Lentz (a police officer then on duty) was purposefully done by one of the three conspirators, the three then at-tempting to and acting in a common design to escape or avoid arrest while fleeing from the scene of a robbery just committed, carrying with them the stolen property, at a point of time before they, the robbers, had reached a haven of safety and before the "loot" was divided, and that the killing of the officer was purposely done while, and as a proxi-mate result of, and during, the perpetrating of a robbery in which this defendant and Davis and Lyons were still acting as co-conspirators.

The evidence adduced by the state on which this finding is predicated has been briefly detailed above but some elaboration is necessary. When Milam stopped the Cadillac and Lieutenant Lentz walked up to the left door by the driver's seat of the defendant's automobile, he asked "What is going on here?" * * * "This man (Buchanan) tells me you robbed

him." The Lieutenant directed all three men to remain in the Cadillac, and then returned to the police car and used the radio. This fact, together with the subsequent arrival of other officers, leaves the inference that he called for help, Lieutenant Lentz then returned to the Cadillac with Buchanan following behind. All three men in the Cadillac had obeyed the officer's instructions to remain where they were. Some conversation then ensued between Buchanan, the Lieutenant, Davis, and Lyons, during which time Lyons attempted to get out of the automobile but on each occasion was directed to get back in, which commands he obeyed.

He did, however, leave his seat in the automobile unnoticed, walked or ran to the rear of the car, and crossed over to the left side while Lieutenant Lentz was looking at Buchanan. Buchanan testified that Lyons pushed him aside, pointed a gun at Lieutenant Lentz and fired the bullet, striking the Lieutenant in the forehead, causing almost instant death. Lyons fired a second shot at the Lieutenant after he had fallen to the ground and then ran east on Quimby in attempting to make his escape. In the meantime, Davis, who had been sitting between Milam and Lyons, edged to the right side of the front seat of the Cadillac and, either before or at the time the first shot was fired, started to run east on Quimby to escape from the scene, Buchanan ran west toward his home. This defendant did not move from his automobile until other police officers arrived on the scene. His testimony as to the part of his conduct or actions just prior to and at the scene of the murder is as follows:

"A. I took the gun out of my pocket and threw it on the floor and I took the money and threw it on the floor and I told James—

"* * *

"A. Well, I told James Davis that I didn't want anything to do with that. I said, 'You told me that there wasn't going to be any trouble and now you have took this from him.'

"* * *

"Q. And when you heard the police siren, was there any conversation between you and the other two men in the car?

"A. Yes, sir.

"Q. What conversation was that?

"A. Davis said, 'Don't stop.'

"A. And what, if anything, did you say?

"A. I said, 'No, I'm going to stop.'

"Q. And did you stop?

"A. Yes, sir, I did.

"Q. And then what, if anything, happened?

"A. Well, I stopped and turned off the ignition and it was about, approximately a half a minute, and the police officer came out of the car, stopped a car behind us and got out of the car and walked up to my car.

"* * *

"A. He asked us what had been going on, or something to that effect.

"He said, 'this man tells me you robbed him,' or something like that. 1 don't remember the exact words.

"Q. All right, he said, 'What's been going on? This man says you robbed him. .

"What, if any, reply was made to the officer at that time, and if there was one, by whom was it made?

"A. Yes, sir. Robert Lyons told him that we haven't he said, 'Officer, we haven't robbed anybody. We just got what belonged to us.'

"Q. And what, if anything, did the officer then do or say?

"A. He told us to stay in the car.

"Q. And then what, if anything, did the officer do, if you know?

"A. He walked back to his car.

"Q. And how long was he back at his car? Do you know, approximately?

"A. I would say 45 seconds, sir.

"Well, no, about a minute, about a minute, sir.

"Q. And he walked back to his car for a minute and then what, if anything, did he do?

"A. He came back to my car, sir.

"* * *

"Q. Then what, if anything, did he say at that time?

"A. He opened the door and took the keys out of my car.

"Q. Now, when he opened the door of your car, sir, and took the keys out, how close was that officer to you?

"A. Well, he touched me, sir.

"Q. He touched you; he leaned in the car and took the keys out; is that correct?

"A. Yes, sir, correct, sir.

"Q. And what did he say, if anything, to you?

"A. He said, he told us to stay in the car. 'You're under arrest.'

"Q. And then what, if anything, happened?

"A. Well, at about this point, Robert Lyons attempted to get out of the car on the far side.

"Q. And what, if anything, was said at that time?

"A. The officer told him to get, to stay in the car.

"Q. I see.

"* * *

"Q. What conversation occurred then?

"A. Alonzo Buchanan ran up to my car and he said, 'Yes, sir,' or, he said, 'Officer, those are the guys that robbed me.'

"Q. And then what, if anything, did the officer do?

"A. Well, he was trying to talk to us and Robert Lyons and James Davis were hollering across. Everybody was hollering, and I told James Davis and Robert Lyons, I said, 'Fellows, let's be quiet and let the officer say what he has to say.'

"Q. And what then occurred?

"A. Well, again Robert Lyons attempted to get out of the car.

"Q. And what did the officer—what happened when he tried to get out of the car the second time?

"A. The officer told him to stay in the car.

"Q. And then what, if anything, occurred?

"A. Well, the officer was standing talking to all of us and Robert Lyons then got out on the right side of the car.

"Q. Lyons got out on the right side of the car?

"A. Correct, sir.

"Q. And when he got out on the right side of the car, was he quiet or was he talking?

"A. I don't recollect, sir. Everyone was hollering and arguing. I couldn't understand no certain word, that anybody said.

"Q. Well, were you hollering?

"A. No, sir, I wasn't.

"Q. So Lyons got out of the car hollering, is that correct?

"A. Everyone was hollering, sir.

"I heard Lt. Lentz holler two or three times to bet gack in the car.

"Q. When you say 'Lt. Lentz,' you did not know his name at that time, did you?

"A. No, sir.

"Q. Now, what, if anything, did you observe Robert Lyons do then?

"A. He went around the right rear of the car, sir.

"Q. He went around the right rear of the car, and when he went around to the right rear of the car what, if anything, did the officer do?

"A. Well, he just looked back across the car, sir.

"Q. And did the officer say anything?

"A. He yelled, 'Get back in the car.'

"Q. At Lyons?

"A. Yes, sir.

"Q. Now, when he was yelling, 'Get back in the car,' at Lyons, you stated he was standing in the open doorway of the car beside you, is that correct?

"A. That's right.

"Q. How close sir, was he to you when he was standing there?

"A. From six inches, six inches to a foot, sir.

"Q. Now, what, if anything, was James Davis doing while the officer was yelling to Lyons to get back in the car?

"A. He motioned for me to run.

"Q. And what, if anything, did you do?

"A. I told him no, that I was going to stay there.

"Q. And what, if anything, did James Davis then do?

"A. Well, he told me, he said, 'We got to, man, we got to.'

"Q. And what did you say?

"A. I told him, no, that we have to stay here.

"Q. And then what, if anything, did Davis do?

"A. Well, he just kept sliding toward the other side of the car, sir.

"Q. And then what did he do after he slid to the other side of the car?

"A. Well, at about this point, I heard, I heard two shots fired."

The foregoing testimony is corroborated to some extent by Davis, Buchanan, and three or four state's witnesses, who lived in the houses fronting on Quimby at the point of the crime, and who were awakened by the police siren and observed the scene from their windows.

The legal problem here involved, as claimed by the defendant, is whether it could be said that the escape from the robbery by the conspirators had come to an end by the police officer's "arrest" of the defendant and his associates by directing them to stay in the automobile. It is claimed that what was done by Lyons after getting out of the automobile, thus disregarding the officer's commands, and immediately firing the shot which caused his death, was in furtherance of his desire to escape arrest, and shows, as a matter of law, that the killing was not a part of the res gestae of the robbery or in furtherance of its perpetration under the provisions of §2901.01 R. C. With this contention we cannot agree.

The interval of time between when the defendant started to drive his companions from the Buchanan house (the scene of the robbery), and the death of Lieutenant Lentz could not, at most, have been more than three or four minutes. The interval between the stopping of the escape car and the officer's death was, of course, a shorter period of itme. The defendant by his own testimony was taking part in the escape. He claims to have surrendered during the attempt by his companions to continue their escape. They did not surrender, but vigorously continued their efforts to avoid arrest. A defendant cannot relieve himself from the probable consequences of such attempt to escape from a robbery just committed (which at this point was a part of the res gestae of the crime) until all those involved, and with whom he is associated, have either surrendered, reached a haven of refuge or until actual immediate pursuit had ceased. One cannot withdraw from his participation in a crime to which he has already contributed his efforts in its accomplishment and which is still in actual perpetration by an act of surrender where his co-conspirators continue their efforts to escape.

The cases in Ohio dealing with the continued liability of persons escaping from the scene of the commission of crime are **Conrad v. State, 75 Oh St 52**, 78 N. E. 957, and **State v. Habig, 106 Oh St 151**, 140 N. E. 195. In the first of these cases, Frank Conrad and another conspired to commit a burglary. They were discovered before accomplishing their purpose. They at once attempted to escape. The officer who was killed was heard to cry out "Halt" which was followed by a revolver shot. Two other shots with a different sound were also heard. The defendant was seen by another officer escaping over the fence at the rear of the lot where the body of the deceasd was found. The body of the deceased was found on the lot adjoining the premises which were the subject of the attempted burglary.

Paragraphs two, three and four of the syllabus provide:

"2. Where one starts to carry out the purpose to commit a rape, arson, robbery or burglary, and kills another under circumstances so closely connected with the crime which he has undertaken as to be a part of the res gestae thereof, he is guilty of murder in the first degree, within the meaning of §6808 R. S., whether the crime which he originally undertook has been technically completed or not.

"3. When two, in furtherance of a common design, enter upon the perpetration of a burglary armed and prepared to kill if opposed, and

while so engaged are discovered, and in the effort to escape one of the burglars kills one who is trying to arrest him, both burglars are equally guilty of the homicide, although one of them was not armed with a deadly weapon, and although such killing was not part of the pre-arranged plan.

"4. When under such circumstances one of the burglars, at a short distance from the building and on another lot, shot and killed a police officer, who had commanded him to halt, the court properly found that the killing was in the perpetration of the burglary, and that it was murder in the first degree."

Here the Ohio Supreme Court held that escape was a part of the res gestae of the crime of attempted burglary, and that when two or more are engaged in the unlawful conspiracy, it matters not which one of the conspirators fired the fatal shot, all are equally guilty of murder in the first degree as a result of a purposeful killing perpetrated by one of the conspirators during the attempted escape by the respective participants.

In the case of **State v. Habig, 106 Oh St 151,** 140 N. E. 195, Habig, with others, participated in several robberies and while making his escape, killed a police officer. The first paragraph of the syllabus provides:

"1. Where several persons have jointly committed the crime of robbery of several victims and have taken from one or more of them property of value and are fleeing from the scene of the robbery and immediately thereafter one of the victims runs a short distance in the opposite direction and notifies policemen of the crime and the direction in which the robbers are fleeing and the policemen pursue the robbers and intercept them within a few minutes thereafter, and when the robbers have proceeded in their flight a distance of not more than five city squares and while they are still in flight carrying the proceeds of the robbery which had not yet been divided among them and the robbers refuse to surrender and one of their number shoots a policeman and inflicts injuries resulting in his death, such homicide is committed in perpetetrating a robbery."

The court, in its opinion, notes the killing of the police officer by Habig in his continuous effort to escape after the actual robbery, about five minutes after the last robbery had been committed, and finds that the attempt to escape is a part of the crime, if pursuit is "immediately begun, and is continued without interruption until the flight has carried the perpetrator to a place of seeming security, or until uninterrupted pursuit is no longer continuously active." On page 163, the court said:

"In the case at bar, while the crime of robbery had sufficiently progressed to support a conviction against Habig for that crime, he was nevertheless still engaged in his felonious purpose, that of carrying away the proceeds of his crime, and there had been no division of the spoils, neither had the conspirators reached a place of seeming security, nor had their continuous flight come to an end. The alarm was so quickly sounded, the pursuit so immediately begun, and so continuously pursued to the point where the homicide was committed, that the con-

clusion must be reached that the homicide was committed by Habig while perpetrating the robbery, and as a part of the res gestae."

In Commonwealth v. Doris, 287 Pa. 547, 135 A. 313, the defendant and his confederates held up a bank depository truck and tried to escape with the loot. Their waiting automobile was disabled and they scattered, abandoning the loot. The defendant, revolver in hand, was captured by pursuers. The others kept up the flight and about ten minutes after the defendant was captured and a half mile away from where he was being held, one of the conspirators, still in flight, killed an officer. The defendant was found guilty of the statutory felony of murder under Pennsylvania law which, in part, provides that a murder committed in the perpetration of, or in an attempt to perpetrate specified felonies (including robbery), shall be murder in the first degree.

The cases above cited express the greater weight of authority on the test as to when the commission of a felony comes to an end for the purpose of applying the statutory felony of murder committed while in the perpetration of a robbery, rape, arson or burglary. The subject was considered in an article in 51 Dickinson Law Review 12, which concludes that "Flight and escape" immediately pursued constitutes a part of the res gestae, that is, a part of the crime from which escape is attempted. This is the rule by the great weight of authority, which certainly is supported by Ohio cases.

The defendant, as shown by the evidence, is eighteen years of age. He has passed the eleventh grade in school. The passing of one more grade would make him eligible for college work. His work record has been good. He has been shown as a man of average intelligence. He certainly can distinguish between right and wrong. In his statement to the police, he detailed the events leading up to the death of Lieutenant Lentz by saying "we" and "us" and the like in many places while describing the conduct of each of the participants in the robbery. The statement parallels, without great deviation, those made by others, during every phase of the holdup. No where in this statement does he suggest threats against his personal safety or that he protested the taking of the money by force. This thought came into the record upon trial some months after the killing and has the appearance of being an afterthought. Certainly if the law is going to hold one of weak mind guilty of his unlawful acts until such defendant can show by the greater weight of the evidence that he does not have sufficient mind to distinguish between right and wrong, it (the law) should not extend immunity to one who participates in a dangerous felony who has an average decree of intelligence, but who fails to use it, as society has the right to expect that he should.

Where there is substantial evidence presented without error to support the judgment of the trial court, a reviewing court should not disturb the judgment. The judgment in this case should be affirmed.