OPINION
Defendant-appellant Rodney Yoho appeals his conviction and sentence from the Perry County Court of Common Pleas on one count of aggravated robbery in violation of R.C. Section 2911.01(A)(1), a felony of the first degree, with a firearm specification. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
On July 29, 1998, the Perry County Grand Jury indicted appellant on one count of aggravated robbery in violation of R.C. Section2911.01(A)(1), a felony of the first degree, and one count of theft in violation of R.C. Section 2913.02(A)(1), a felony of the fifth degree. Both of the counts in the indictment were accompanied by a firearm specification. At his arraignment on August 6, 1998, appellant entered a plea of not guilty to the charges contained in the indictment. An entry memorializing appellant's not guilty plea was filed on August 11, 1998. A written waiver of time signed by appellant was filed with the trial court on September 15, 1998. In such waiver, appellant waived all of his statutory and constitutional speedy trial rights. Subsequently, on September 17, 1998, appellant appeared in open court and entered a plea of not guilty and not guilty by reason of insanity to the charge of aggravated robbery as alleged in the indictment. Thereafter, a jury trial commenced in this matter on January 6, 1999. The following evidence was adduced at the trial. At all relevant times, appellant was residing on Marietta Road in Perry County with John DeLong and Rhonda DeLong. Rhonda DeLong is both John DeLong's wife and appellant's sister. On July 4, 1998, appellant accompanied Rhonda and John DeLong and the couple's daughter to a fireworks celebration in nearby Somerset, Ohio. At trial, Wayne Allen Peck, an acquaintance of both John DeLong's and appellant's, testified that while at the fireworks celebration, appellant "asked me if he could borrow a gun, and I said all my guns was in hock." Transcript of Proceedings at 130. According to Peck, appellant wanted a gun so that he could "make some money somehow" and so that he could "rob a place." Transcript of Proceedings at 131, 132. Peck's conversation with appellant occurred prior to 10:30 P.M. on July 4, 1998. Peck's wife, Remy Peck, also testified that she overheard appellant saying "just that he was going to rob a place." Transcript of Proceedings at 140. Remy Peck further testified that, later the same evening, she heard appellant ask to borrow her husband's gun. Between 11:00 P.M. and midnight on July 4, 1998, an armed gunman with long black hair robbed the Turtle's Mini Mart. The two clerks at the Turtle's Mini Mart testified that the gunman, who had a male voice and was wearing a green and black mask and camouflage clothing, entered the store and demanded money out of the cash register while pointing a shotgun at them. The gunman threatened to use the shotgun. Brian Kner, one of the clerks at the store, gave the gunman money in a brown paper sack. Both clerks testified that over $500.00 in various denominations, including ones, fives, tens, and twenties, was in the sack. After receiving the money, the gunman exited the store and went around behind the store. Eric Wesney, a customer who was sitting in the mini-mart parking lot in his car, testified that the man he saw exiting the store was carrying a shotgun and wearing a dark mask and full body coveralls. Both Eric Wesney and Brian Kner testified that at the time the gunman was exiting the store, a red Jeep was driving by the store. According to Wesney, only one person was in the Jeep at the time. John DeLong owned a red Jeep truck on July 4, 1998. John DeLong, who was convicted of aggravated robbery and theft as a result of the July 4, 1998, robbery of the mini mart, testified at length at the January 6, 1999, trial. According to DeLong, on July 4, 1998, shortly after arriving home from the fireworks celebration, he and appellant left at approximately 11:40 P.M. to go to the mini mart to get some beer. Rhonda DeLong testified at trial that the two had left the DeLong trailer at approximately 11:45 P.M. According to John DeLong, appellant, who John DeLong testified was wearing camouflage overalls at the time, exited the Jeep when the two arrived at the mini mart and "just told me to turn around and pick him up." Transcript of Proceedings at 219. John DeLong further testified that he drove by the mini mart several times before he observed the appellant exit the store and go towards the rear of the store. After appellant got into John DeLong's red Jeep, John DeLong saw that appellant had a shotgun on his person. When John DeLong asked appellant where the beer was, appellant "said he robbed them". Transcript of Proceedings at 223. The two then proceeded home to the DeLong trailer via country roads. Upon arriving at the DeLong trailer, John DeLong pulled his Jeep into a field off of his driveway. Appellant, who exited the Jeep, then proceeded to wrap the shotgun used in the robbery in a white tarp and to hide the same in some weeds. The two then returned to the DeLong residence for a short period of time. John DeLong testified that during such time, appellant "counted some money." Transcript of Proceedings at 225. Approximately ten to fifteen minutes later, both John DeLong and appellant left to go to New Lexington to purchase some beer. Upon pulling into the parking lot of a Dairy Mart in New Lexington, both John DeLong and appellant were arrested by Patrolman Eric Findlay of the New Lexington Police Department. While John DeLong only had some change on his person, appellant had $915.00 in various denominations in bills which were in proper sequential order. A brown paper sack was recovered from the Jeep at the time of the arrests. Mike and Tonita Derreberry, whose trailer is approximately 150 to 200 yards from the DeLong's trailer, also testified at the trial in this matter. Mike Derreberry testified that on the evening of July 4, 1998, he was sitting on his front porch with his wife, Tonita, drinking a beer when he observed John DeLong's Jeep pull into the DeLong driveway. According to Mike Derreberry, "[w]hoever was driving was driving pretty fast." Transcript of Proceedings at 151. The Jeep, Mike Derreberry testified, "[p]ulled in, stopped at the top of the driveway. Somebody got out; got back in and went back down to the house, and the next thing I know, the Jeep was leaving again." Transcript of Proceedings at 152. Although Mike Derreberry was unable to see how many people were in the Jeep, he testified that altogether he heard the Jeep door open and shut two times. Both Mike Derreberry and his wife testified that the Jeep, once it returned to the DeLong residence, only remained there for approximately five to ten minutes before leaving and heading towards New Lexington. The Derreberrys later showed Detective Findlay where they had seen John DeLong's Jeep stop up on the hill. When Detective Findlay explored the area where the Jeep had been stopped, he discovered the shotgun used in the robbery wrapped in a white tarp. The gun, which was found to be operable, was identified at trial as being the gun used by the gunman to hold up the mini mart. At trial, Detective Findlay, testified that, during the morning of the robbery, he went with Deputy Tysinger in an attempt to "locate a way that they [John DeLong and appellant] could have gotten away from us without being detected by the sheriff's department units that were coming to the scene." Transcript of Proceedings at 312 and 313. When Detective Findlay followed the escape route that was identified to him by John DeLong, he found a green and black Halloween mask laying in the roadway. The mask was identified by Rhonda DeLong as being a mask that she had purchased for her two sons that had been in the closet of her house. In addition, both Barbara Jean Riggs and Brian Kner, the clerks at the mini mart, identified the mask as the mask worn by the gunman when the robbery was committed. At the conclusion of the evidence and the end of deliberations, the jury returned on January 7, 1999, with a verdict finding appellant guilty of the offense of aggravated robbery in violation of Section 2911.01(A)(1) and guilty of the offense of theft in violation of Section 2913.02(A)(1). The jury further found that, with respect to the theft offense, the value of the property was in excess of $500.00 and that the appellant did have a firearm on or about his person or under his control while committing both offenses. A Judgment Entry memorializing the jury's verdict was filed on January 11, 1999. On February 1, 1999, the appellant was sentenced to a prison term of nine years for the offense of aggravated robbery. The trial court also imposed an additional term of three years incarceration for the firearm specification. Since the trial court found that theft and aggravated robbery are allied offenses of similar import and since the prosecution had requested that the appellant be sentenced on the offense of aggravated robbery, appellant was not sentenced on the theft offense. A Judgment Entry of Sentence was filed on February 1, 1999. It is from his conviction and sentence that appellant prosecutes his appeal, raising the following assignments of error:
ASSIGNMENT OF ERROR I
 WHERE, AS HERE, THE TESTIMONY OF AN ALLEGED ACCOMPLICE WHO HAS ALREADY BEEN FOUND GUILTY OF THE SAME OFFENSE, AND WHO HAS AGREED TO TESTIFY AGAINST DEFENDANT/APPELLANT IN EXCHANGE FOR THE PROSECUTOR'S AGREEMENT TO RECOMMEND THAT HE RECEIVE THE SAME SENTENCE AS PROPOSED IN EXCHANGE FOR A GUILTY PLEA, AND WHERE, AS HERE, A FULL REVIEW OF ALL THE EVIDENCE ESTABLISHES THAT DEFENDANT/APPELLANT WOULD NOT HAVE BEEN FOUND GUILTY BUT FOR SUCH TESTIMONY, SUCH TESTIMONY IS SO FRAUGHT WITH WEAKNESS THAT REVERSAL IS REQUIRED.
ASSIGNMENT OF ERROR II
 AN APPELLATE COURT SHALL NOT ABDICATE ITS RESPONSIBILITY TO ENTER JUDGMENT OF ACQUITTAL WHEN AN EXAMINATION OF THE ENTIRE RECORD LEADS TO A DETERMINATION THAT THE EVIDENCE PRODUCED FAILS TO ATTAIN THE HIGH DEGREE OF PROBATIVE FORCE AND CERTAINTY REQUIRED OF A CRIMINAL PROSECUTION, AND SUCH EVIDENCE IS THUS LEGALLY INSUFFICIENT TO SUSTAIN A CONVICTION.
 I, II
Appellant, in his two assignments of error, argues that his conviction was not supported by sufficient evidence and that the verdict was against the manifest weight of the evidence. Appellant specifically maintains that John DeLong's testimony was "unworthy of belief" and "not deserving of any weight whatsoever". Although John DeLong, at the time of appellant's trial, had been convicted of both aggravated robbery and theft, he had not yet been sentenced. According to appellant, John DeLong's testimony was fraught with weakness since DeLong was testifying against appellant as part of a plea bargain with the prosecutor. Pursuant to such plea bargain, the prosecutor was to recommend a seven year sentence in exchange for DeLong's testimony at appellant's trial. However, no promises were made to DeLong in exchange for his testimony. In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jenks, supra, at paragraph two of the syllabus.
On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed . . . The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387 citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1. As stated above, appellant contends that the testimony of his accomplice, John DeLong, is unreliable since Detective Findlay told DeLong that Detective Findlay would recommend a seven year sentence to secure DeLong's testimony at appellant's trial. However, the jury, as trier of fact, clearly had the opportunity to observe John DeLong's demeanor and to assess his credibility as a witness. In reviewing the credibility of a witness, an appellate court must give deference to any determination on the credibility of witnesses made by the trier of fact. State v. Reed (1998),128 Ohio App.3d 520, 526. Clearly, the jury, as trier of fact, found John DeLong's testimony credible. Appellant relies on the case of State v. Milam (1959), 108 Ohio App. 254, for the proposition that the testimony of an accomplice, such as John DeLong, is fraught with weakness. However, unlike in Milam, supra., John DeLong's testimony was not discredited by the evidence produced at trial, but rather was corroborated by such evidence. At trial, John DeLong testified that on July 4, 1998, he and appellant left their home at approximately 11:45 P.M. to go to Turtle's Mini Mart to get beer. Appellant, according to John DeLong, was wearing camouflage overalls at the time. Not only did both clerks at the mini mart testify that the armed robber was wearing camouflage clothing, but in addition, Eric Wesney, a store customer who was in the parking lot at the time of the robbery, also testified that the robber was wearing full body coveralls. Wesney further corroborated John DeLong's testimony that, after dropping appellant off at the store, DeLong drove past the store a number of times in his red Jeep while waiting for the appellant. In addition, one of the store clerks, Brian Kner, testified that he saw a red Jeep pickup driving around the mini mart after the robbery had taken place. As stated above, John DeLong also testified that both he and appellant, after the robbery, returned home along various country roads. When Detective Findlay followed the route mentioned by John DeLong, he found a mask which was the same mask as used in the robbery and the same mask as missing from the DeLong residence. Moreover, Detective Findlay also found the shotgun used in the robbery based on both DeLong's testimony as well as that of Michael and Tonita Derreberry. Furthermore, when appellant was arrested, approximately $915.00 in various denominations, including large denominations which were in sequential order, was discovered in appellant's pants pocket. We find that the jury, as trier of fact, clearly had the opportunity to observe the demeanor of all the witnesses, including John DeLong, and clearly found DeLong's testimony, which was supported by the evidence, to be credible. There is no evidence that the jury, as trier of fact, clearly lost its way and created a manifest miscarriage of justice. Furthermore, after reviewing the evidence in a light most favorable to the prosecution, this court finds that any rational trier of fact, based upon the facts set forth in detail above, could have found the essential elements of the crime of aggravated robbery proven beyond a reasonable doubt and that appellant committed such crime. As is stated above, the gunman who robbed the mini mart on July 4, 1998, had long black hair and was wearing camouflage clothing. Wayne Allen Peck testified at trial that earlier on the evening of July 4, 1998, appellant, who had long black hair at the time, had asked to borrow Peck's gun so that appellant could "make some money somehow" and so that appellant could "rob a place." Transcript of Proceedings at 131, 132. Peck further testified that, at the time, appellant was wearing camouflage pants. Remy Peck, Wayne Allen Peck's wife, overheard appellant ask to borrow a gun from her husband to commit a robbery. When appellant was apprehended on the night of the robbery, appellant had $915.00 in various denominations in bills on his person which were in proper sequential order. In short, based upon the testimony presented at trial, there was competent, credible evidence that appellant, on the night of July 4, 1998, used a deadly weapon, specifically a shotgun, to commit a theft offense. Accordingly, we find that appellant's conviction was not against the manifest weight or the sufficiency of the evidence.
The Judgment of the Perry County Court of Common Pleas is, therefore, affirmed.
By EDWARDS, J. WISE, P.J. and HOFFMAN, J., concur.